**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

**JACOB LEVSEN**, individually and on behalf of all others similarly situated,

Contact through attorneys: Lee Segui PLLC, 900 W. Morgan St., Raleigh, NC 27603

County of Residence: Montgomery County, PA

Plaintiff,

v.

**HEALTHCARE INTERACTIVE, INC., d/b/a HCIactive**,

Address: 6011 University Blvd., Suite 400, Ellicott City, MD 21043

County of Residence: Howard County, MD

Defendant.

Case No. 1:25-cv-4210

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Jacob Levsen ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through the undersigned attorneys, brings this Class Action Complaint against Defendant Healthcare Interactive, Inc., d/b/a HCIactive ("HCIactive" or "Defendant"), and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters as follows.

## INTRODUCTION

1. Plaintiff brings this class action against HCIactive for its failure to secure and safeguard approximately 87,565 individuals' (including Plaintiff's) personally identifiable information ("PII") and personal health information ("PHI"), including names, dates of birth; email addresses; phone numbers; mailing addresses; Social Security numbers; blood results and/or

biometric data; health insurance enrollment data (such as health plans/policies, insurance companies, and member/group ID numbers); medical data (such as medical record numbers, doctors, diagnoses, care, prescription information, and treatment); and health insurance claims data (such as claim numbers, account numbers, explanation of benefits, and billing codes).

2. HCIactive is a software company that provides artificial intelligence solutions for health insurance companies.

3. Between approximately July 8, 2025, and July 12, 2025, an unauthorized individual or individuals gained access to HCIactive's computer network and copied the PII/PHI of Plaintiff and Class members (the "Data Breach").

4. HCIactive had a duty to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. HCIactive breached those duties by, *inter alia*, failing to implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure.

5. As a result of HCIactive's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all persons whose PII/PHI was exposed as a result of the Data Breach.

6. Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, negligence per se, unjust enrichment, and violation of the Maryland Consumer Protection Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

**Plaintiff Jacob Levsen**

7. Plaintiff Jacob Levsen is a citizen and resident of Pennsylvania.

8. HCIactive obtained Plaintiff's PII/PHI through its work with insurance companies.

9. In connection with providing services to its clients, HCIactive stored and maintained Plaintiff's PII/PHI on its systems, including the system involved in the Data Breach.

10. Plaintiff received a letter from HCIactive notifying him that his PII/PHI was exposed in the Data Breach.

11. Since the Data Breach occurred, Plaintiff has spent time checking his credit and freezing his credit in order to prevent or mitigate the effects of identity theft.

12. As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; deprivation of the value of his PII/PHI; and lost time and money mitigating the effects of the Data Breach.

**Defendant Healthcare Interactive, Inc., d/b/a HCIactive**

13. Defendant Healthcare Interactive, Inc., d/b/a HCIactive is a Delaware corporation with its headquarters located at 6011 University Blvd., Suite 400, Ellicott City, MD 21043. It may be served through its registered agent: The Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, MD 21093.

## JURISDICTION AND VENUE

14. The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a

citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

15. This Court has general personal jurisdiction over HCIactive because it maintains its principal place of business in this District, regularly conducts business in Maryland, and has sufficient minimum contacts in Maryland.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because HCIactive's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of HCIactive*

17. HCIactive states that its goal is to "modernize insurance and health administration with a unified, AI-powered platform built for today's workforce."[1] The company advertises several solutions for its customers, including an AI engine and a "healthspace cloud."[2]

18. In the regular course of its business, HCIactive collects and maintains the PII/PHI of its client's customers.

19. HCIactive's website contains a Privacy Policy (the "Privacy Policy").[3] In the Privacy Policy, HCIactive tells its customers that the "protection of your privacy is very important to us."[4]

---

[1] *We Are HACIactive*, HCIactive, https://www.hciactive.com/about (last accessed Dec. 18, 2025).

[2] *Smarter Solutions for Health Administration & Insurance*, HCIactive, https://www.hciactive.com/solutions (last accessed Dec. 18, 2025).

[3] *Terms of Service*, HCIactive, https://hci.healthspace.net/MemberPortal/Account/TermsOfService (last accessed Dec. 18, 2025).

[4] *Id.*

20. Plaintiff and Class members are, or were, customers of HCIactive's clients, and HCIactive stored Plaintiff's and Class members' PII/PHI on its network system.

***The Data Breach***

21. Between approximately July 8, 2025, and July 12, 2025, an unauthorized individual, or unauthorized individuals, "copied certain files from [HCIactive's] computer network."[5] HCIactive did not discover the Data Breach until on or about July 22, 2025, 10 days after the Data Breach ended. An investigation into the Data Breach determined that PII/PHI was included in the Data Breach.[6] The PII/PHI accessed in the Data Breach includes:

- "Personal information (such as name, address, date of birth, Social Security number, phone number, and email address)
- Health insurance enrollment data (such as health plans/policies, insurance companies, member/group ID numbers)
- Medical data (such as medical record numbers, doctors, diagnoses, prescriptions, lab results, images, care, and treatment)
- Health insurance claims data (such as claim numbers, account numbers, explanation of benefits, and billing codes)."[7]

22. According to a data breach notification posted on the Office of the Maine Attorney General's website, approximately 87,565 individuals' PII/PHI was compromised during the Data Breach.[8]

23. HCIactive did not begin to notify impacted breach victims about the data breach until December 2, 2025, almost five full months after the Data Breach.[9] HCIactive's failure to

---

[5] *Notice of Data Privacy Event*, HCIactive, https://healthspacemedia.blob.core.windows.net/hci/HCIactive%20Website%20Notice.pdf (last accessed Dec. 18, 2025).
[6] *Id.*
[7] *Id*.
[8] *Data Breach Notifications*, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/7c2cf268-789c-4d19-adcf-e1cf8169a7c3.html (last accessed Dec. 18, 2025).
[9] *See Notice of Data Privacy Event*, *supra* note 5.

promptly notify Plaintiff and Class members that their PII/PHI was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their PII/PHI will be misused and their identities will be (or already have been) stolen and misappropriated.

***HCIactive Knew that Criminals Target PII/PHI***

24. At all relevant times, HCIactive knew, or should have known, that the PII/PHI it collects and maintains was a target for malicious actors. Despite such knowledge, HCIactive failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from cyber-attacks that HCIactive should have anticipated and guarded against.

25. It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[10]

26. Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, Kroll found that "the healthcare industry was the most breached" in

[10] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

2024.[11] The company found that 23% of the breaches that it handled responses for were from the healthcare industry, up from 18% in 2023.[12]

27. PII/PHI is a valuable property right.[13] The value of PII/PHI as a commodity is measurable.[14] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[15] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[16] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

28. As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

---

[11] Denyl Green, *Data Breach Outlook*, KROLL (Feb. 18, 2025), https://www.kroll.com/en/insights/publications/cyber/data-breach-outlook-2025.
[12] *See id.*
[13] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.
[14] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.
[15] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.
[16] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

29. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[17] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[18]

30. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[19] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[20]

31. Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[21] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[22]

---

[17] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[18] *Id.*

[19] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[20] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[21] Steager, *supra* note 17.

[22] *Id.*

32. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[23]

33. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

***Theft of PII/PHI Has Grave and Lasting Consequences for Victims***

34. Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[24] [25]

35. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying

[23] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[24] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Dec. 18, 2025).

[25] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[26]

36. Identity theft is not an easy problem to solve. In a 2025 survey, the Identity Theft Resource Center found that 20% of victims of identity misuse needed more than 30 days to resolve issues stemming from identity theft and 13% required three months or more.[27]

37. Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[28] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[29] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [30] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[31]

---

[26] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[27] Identity Theft Resource Center, *2025 Consumer Impact Report*, IDENTITY THEFT RES. CTR. (2025), https://www.idtheftcenter.org/publication/itrc-2025-consumer-impact-report/ (last accessed Dec. 18, 2025).

[28] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[29] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 20.

[30] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Dec. 18, 2025).

[31] *Id*.

38. A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

a. Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b. Significant bills for medical goods and services neither sought nor received.

c. Issues with insurance, co-pays, and insurance caps.

d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

f. As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own. [32]

39. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[33]

[32] *See* Dixon & Emerson, *supra* note 28.
[33] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

40. It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

***Damages Sustained by Plaintiff and the Other Class Members***

41. Plaintiff and all other Class members have suffered injury and damages, including, but not limited to: (i) a substantially increased and imminent risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; and (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## CLASS ALLEGATIONS

42. This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

43. Plaintiff brings this action on behalf of himself and all members of the following Class of similarly situated persons:

> All persons whose personally identifiable information and personal health information was accessed by unauthorized persons in the Data Breach, including all persons who were sent a notice of the Data Breach.

44. Excluded from the Class are Healthcare Interactive, Inc., and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

45. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

46. The members in the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. HCIactive has reported to the Office of the Maine Attorney General that 87,565 persons were affected by the Data Breach.[34]

47. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. whether HCIactive had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

b. whether HCIactive had duties not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

c. whether HCIactive failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

d. whether HCIactive engaged in unfair or unlawful practices by failing to safeguard the PII/PHI of Plaintiff and Class members;

e. whether HCIactive breached its duties to protect Plaintiff's and Class members' PII/PHI; and

f. whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

48. HCIactive engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual

[34] *See Data Breach Notifications*, *supra* note 8.

questions, if any, pale in comparison in both quantity and quality to the numerous common questions that dominate this action.

49. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by HCIactive, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

50. Plaintiff will fairly and adequately represent the interests of the Class members. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature. Plaintiff has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff and his counsel have adequate resources to assure the interests of the Class will be adequately represented.

51. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against HCIactive, so it would be impracticable for Class members to individually seek redress from HCIactive's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

52. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

53. HCIactive owed a duty to Plaintiff and all other Class members to exercise reasonable care in safeguarding and protecting their PII/PHI in its possession, custody, or control.

54. HCIactive knew, or should have known, the risks of collecting and storing Plaintiff's and Class members' PII/PHI, and the importance of maintaining secure systems. HCIactive knew, or should have known, of the many data breaches that targeted health care providers in recent years.

55. Given the nature of HCIactive's business, the sensitivity and value of the PII/PHI its collects and maintains, and the resources at its disposal, HCIactive should have identified the vulnerabilities in its systems and prevented the Data Breach from occurring.

56. HCIactive breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiff's and Class members' PII/PHI.

57. It was, or should have been, reasonably foreseeable to HCIactive that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and

software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

58. But for HCIactive's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

59. As a result of HCIactive's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased and imminent risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; and (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT II
## NEGLIGENCE PER SE

60. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

61. HCIactive's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

62. HCIactive's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including,

as interpreted by the FTC, the unfair act or practice by businesses, such as HCIactive, of failing to employ reasonable measures to protect and secure PII/PHI.

63. HCIactive's duties also arise from the Maryland Personal Information Protection Act ("MPIPA"), Md. Code Ann., Com. Law § 14-3501, *et seq.*, which requires:

> a business that owns, maintains, or licenses personal information of an individual residing in the State shall implement and maintain reasonable security procedures and practices that are appropriate to the nature of the personal information owned, maintained, or licensed and the nature and size of the business and its operations.

Md. Code Ann., Com. Law § 14-3503(a).

64. HCIactive violated HIPAA Privacy and Security Rules, Section 5 of the FTCA, and the MPIPA by failing to use reasonable measures to protect Plaintiff's and all other Class members' PII/PHI and not complying with applicable industry standards. HCIactive's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

65. HCIactive's violations of HIPAA Privacy and Security Rules, Section 5 of the FTCA, and the MPIPA constitutes negligence per se.

66. Plaintiff and Class members are within the class of persons that HIPAA Privacy and Security Rules, Section 5 of the FTCA, and the MPIPA were intended to protect.

67. The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules, Section 5 of the FTCA, and the MPIPA were intended to guard against.

68. It was, or should have been, reasonably foreseeable to HCIactive that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and

audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

69. The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of HCIactive's violations of HIPAA Privacy and Security Rules, Section 5 of the FTCA, and the MPIPA. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased and imminent risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; and (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## **COUNT III**
## **UNJUST ENRICHMENT**

70. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

71. Plaintiff and Class members conferred a benefit upon HCIactive through the provision of their PII/PHI.

72. HCIactive accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. HCIactive benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was used to perform its services to its clients.

73. As a result of HCIactive's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the amount of profits HCIactive made without reasonable data

privacy and security practices and procedures, and the profits HCIactive would have made with reasonable data privacy and security practices and procedures.

74. HCIactive should not be permitted to retain the money belonging to Plaintiff and Class members because HCIactive failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

75. HCIactive should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT IV**
**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT ("MCPA")**
**Md. Code Ann., Com. Law § 13-101, *et seq.***

76. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

77. The purpose of the Maryland Consumer Protection Act is "to set certain minimum statewide standards for the protection of consumers across the State [of] [Maryland]." Md. Code Ann., Com. Law § 13-102(b)(1).

78. HCIactive, Plaintiff, and Class members are all "persons" as defined in the MCPA. Md. Code Ann., Com. Law § 13-101(h). Plaintiff and Class members are all "consumers" as defined in the MCPA. Md. Code Ann., Com. Law § 13-101(c).

79. The MCPA prohibits a person from engaging in "any unfair, abusive, or deceptive trade practice" in the sale of goods or services. Md. Code Ann., Com. Law § 13-303.

80. HCIactive has violated the Maryland Consumer Protection Act by engaging in the unfair practices alleged herein. Pursuant to HIPAA (42 U.S.C. § 1302d *et seq.*), the FTCA, and

Maryland law, HCIactive was required, but failed, to protect Plaintiff's and Class members' PII/PHI and maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class members' PII/PHI. This constitutes a violation of the Maryland Consumer Protection Act.

81. Further, HCIactive has violated the MPIPA, which requires "a business that owns, maintains, or licenses personal information of an individual residing in the State shall implement and maintain reasonable security procedures and practices that are appropriate to the nature of the personal information owned, maintained, or licensed and the nature and size of the business and its operations." Md. Code Ann., Com. Law § 14-3503(a).

82. A violation of the MPIPA is "an unfair or deceptive trade practice within the meaning of" the MCPA. Md. Code Ann., Com. Law § 14-3508(1).

83. As a result of HCIactive's above-described wrongful violations of the MCPA, Plaintiff and all other Class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, inter alia: (i) a substantially increased and imminent risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; and (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

84. Plaintiff and Class members seek damages pursuant to Md. Code Ann., Com. Law § 13-408(a). Plaintiff and Class members also seek declaratory judgment that HCIactive's data security practices were not reasonable or adequate and caused the Data Breach under the MCPA, as well as injunctive relief enjoining the wrongful acts and practices of HCIactive

described herein and requiring HCIactive to employ and maintain industry accepted standards for data management and security.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: December 19, 2025

Respectfully submitted,

/s/ *Thomas Pacheco*
Thomas Pacheco (Bar No. 1712140091)
**LEE SEGUI PLLC**
900 W. Morgan St.
Raleigh, NC 27603
Tel: 919.421.7782
tpacheco@leesegui.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Attorneys for Plaintiff Jacob Levsen*

**Pro hac vice* forthcoming